THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : 3:22-CR-318 |
| | : (JUDGE MARIANI) |
| VICTOR BLANCO, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On September 13, 2022, a federal grand jury indicted Defendant Victor Blanco for Assault with a Dangerous Weapon, in violation of 18 U.S.C. § 113(a)(3) (Count I) as a result of an altercation on or about August 24, 2022 wherein Defendant Blanco and co-Defendant Isaac Carreno allegedly "knowingly and intentionally assault[ed] an individual with a dangerous weapon . . . with intent to do bodily harm, without just cause or excuse" while incarcerated at USP-Canaan. (Doc. 1).

On March 17, 2023, Defendant Blanco filed a Motion to Suppress Statements (Doc. 40) requesting that the Court suppress statements made by Blanco on two separate occasions to Lieutenant Mark Turner, arguing that Defendant was not advised of his *Miranda* rights prior to either conversation with Lieutenant Turner.

The Court held an evidentiary hearing on Defendant's suppression motion on June 16, 2023. At the hearing, the Government presented the testimony of Lieutenant Turner. Defendant did not present any witness testimony. Following the evidentiary hearing,

counsel for both parties presented oral argument in support of their respective positions.

The parties having fully briefed and argued the issues and the Court having conducted an evidentiary hearing and oral argument, Defendant's motion to suppress is now ripe for resolution. For the reasons set forth herein, the Court will grant in part and deny in part the Motion to Suppress Statements (Doc. 40).

## II. BACKGROUND

The testimony of Mark Turner at the evidentiary hearing, in conjunction with the exhibits admitted at the hearing, provide the basis for the relevant factual background of Defendant's motion.

Mark Turner began working for the Bureau of Prisons in 2012 and is currently a Special Investigative Agent ("SIA") at FCI-Otisville in New York. (Test. of Turner, Hr'g Tr., June 16, 2023, at 5). Prior to working at FCI-Otisville, Turner worked at USP-Canaan from 2012 to early-2023, first as a correctional officer, then as a Special Investigative Services Technician, and finally as a Special Investigative Services Lieutenant ("SIS Lieutenant") during his final two and a half years at USP-Canaan. (*Id.* at 6). As an SIS Lieutenant, Turner assisted the SIA "in overseeing the SIS Office, but [his] main duties were to complete weekly and monthly reports for the region and to complete all inmate investigations." (*Id.* at 7).

At approximately 8:35 a.m. on August 24, 2022, Turner was on duty when he became aware of an assault allegedly involving inmates Blanco, Carreno, and Francisco

Rivera-Suazo. (Test. of Turner, Hr'g Tr., June 16, 2023, at 9-10, 11). Inmates Carreno and Blanco were brought to the "Lieutenant's Office" and Turner conducted a post-incident preliminary interview with Blanco. (*Id.* at 11-12).[1] During the interview, Blanco was in hand restraints and admitted that he was affiliated with the Surenos (*id.* at 13, 14), which Turner described as a "Hispanic gang that are extremely loyal to the Mexican Mafia" and are known as "the soldiers for the Mexican Mafia" (*id.* at 25). [2]

On September 2, 2022, Turner met with Blanco in the Special Housing Unit ("SHU") Lieutenant's Office to discuss the BOP's Gang Disassociation Program. (Test. of Turner, Hr'g Tr., June 16, 2023, at 25). The purpose of this program "is for inmates to be housed in a facility, if they complete the program, with people that are viewed as ex-gang members or inactive gang members [and] for them . . . to not participate in gang activity anymore and be housed in a different facility with other inmates that have completed the program." (*Id.* at 17). Turner described the initial process he follows to inform an inmate about the Gang Disassociation Program as follows:

---

[1] A post-incident preliminary interview takes place after an incident occurs within the prison. At that time, Turner and one or more individuals in his office "go in and interview the individuals that are involved and attempt to determine if there's still a bigger issue out there in general population, stemming from the incident that just occurred" and to gain information about the incident. (Test. of Turner, Hr'g Tr., June 16, 2023, at 8; *see also, id.* at 13-14).

[2] Because the Government concedes that Blanco was subject to a custodial interrogation on August 24, 2022 (*see* Doc. 45, at 14, 16-17) and withdrew its objection at the hearing to Defendant's motion to suppress Blanco's August 24 statement that he was affiliated with the Surenos (*see* Hr'g Tr., June 16, 2023, at 56), the Court has only briefly summarized herein the testimony provided by Turner as to this interrogation.

> So when we attempt to transfer an inmate out of the facility, we have to afford them the opportunity to participate in the Disassociation Program. When we educate and when we inform an inmate of the Disassociation Program, he can refuse right then and there, and I have a refusal form with me, or he can consent to participate in that program, which I have a Consent Form.
>
> If he refuses, it ends right there. If he consents or consents to participate in it, we would provide him further documentation for him to fill out, and then all of that documentation would be sent to the National Gang Unit for review to determine if he's eligible and provided enough information or not eligible because he didn't provide enough credible information.

(*Id.* at 16-17).

According to Turner, he believed that Blanco was associated with a prison gang "[b]ased on his self-admission, . . . tattoos that he has, . . . group photos and other inmates that he associated with on a daily basis." (Test. of Turner, Hr'g Tr., June 16, 2023, at 24). When asked what "self-admission" meant, Turner explained that "[w]hen inmates come into a facility, they're screened by the Special Investigative Service staff, and we always ask who you're affiliated with" and that "at another facility, [Blanco] admitted to being affiliated with the Surenos." (*Id.*). On September 2, 2022, Turner admitted that he knew there was suspicion that the Surenos gang had been involved in the assault of Rivera-Suazo on August 24, 2022 and that he believed that Blanco, Carreno and Rivera-Suazo were all members of the Surenos. (*Id.* at 48).

Turner explained that the purpose of his meeting with Blanco in the SHU Lieutenant's Office on September 2, 2022 was "to afford [Blanco] the opportunity to disassociate himself from the gang, because he would be put in for transfer, and for the

administrative transfer process, I have to afford him that opportunity." (Test. of Turner, Hr'g Tr., June 16, 2023, at 26). Another SIS Lieutenant was also present during this meeting. (*Id.* at 26, 42-43). Neither officer was armed. (*Id.* at 26). Blanco was secured in hand restraints, which was required by SHU policy and was the standard way for inmates to be moved throughout the SHU facility. (*Id.* at 26, 51). The Lieutenant's Office is "a normal office-sized room" with a desk, chairs, filing cabinet, shelves, and a door. (*Id.* at 26). The room does not have any bars or windows except for a window in the door. (*Id.* at 26, 44).

During the meeting, Turner had both a Consent Form and Debrief Refusal Form and "explained to [Blanco] that [Turner] was there to afford him the opportunity to disassociate himself from the gang." (Test. of Turner, Hr'g Tr., June 16, 2023, at 27). In response to Turner's explanation, Blanco allegedly said "'I'm a Sureno. I don't sign shit.'" (*Id.* at 27). After Blanco made this statement, "[t]he interview immediately ended" and Blanco was escorted back to his cell. (*Id.* at 28). Turner did not inform Blanco that he had the right to remain silent or to end the interview at any time because he "wasn't there to interview him, [and] wasn't there to gain any information from [Blanco] or ask him any questions. [Turner] was there to inform [Blanco] on the disassociation process and advise him he has an opportunity to disassociate himself or to refuse, but . . . was not there to ask [Blanco] any questions." (*Id.* at 28-29; *see also, id.* at 46).

If an inmate declines to join the program, Turner requests that the inmate sign a "Debrief Refusal" acknowledging "that they are refusing to participate in the debrief

5

process." (Test. of Turner, Hr'g Tr., June 16, 2023, at 21). Here, Turner wrote on the top of the Debrief Refusal form the date ("9-2-2022"), inmate name ("Blanco, Victor"), and identified Blanco as a Sureno Member. (*See* Hr'g Ex. G-3; Test. of Turner, Hr'g Tr., June 16, 2023, at 28). Turner signed the form and, because Blanco refused to sign the Debrief Refusal form, Turner wrote "Refused" on the Inmate Signature line. (*Id.*). Turner testified that during the course of initial debriefing interviews, hundreds of inmates have refused to join the Disassociation Program and when so refusing, did not indicate the name of the gang they were allegedly associated with. (Test. of Turner, Hr'g Tr., June 16, 2023, at 52).

### III. ANALYSIS

Defendant's Motion to Suppress Statements (Doc. 40) moves for the suppression of Blanco's alleged statements made on August 24, 2022, and September 2, 2022, both admitting his affiliation with the Sureno gang. Because the Government has withdrawn its objection to Defendant's motion to suppress the statement made to Lieutenant Turner on August 24, 2022 in the Lieutenant's Office (*see* Hr'g Tr., June 16, 2023, at 56; Doc. 45, at 14, 16-17), the Court will grant Defendant's motion as to the August 24, 2022 statement. The issue presently before the Court is thus whether Blanco was subject to custodial interrogation without being informed of his *Miranda* rights during his conversation with Turner on September 2, 2022.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST.

AMEND. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461 (1966)). The Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as the "*Miranda* warnings," a defendant in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id*. at 479.

"No *Miranda* warning is required absent a 'custodial interrogation.'" *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009); *see also Miranda*, 384 U.S. at 444. "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original). "[T]he determination of whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted).

7

In determining whether an individual is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations and quotation marks omitted). However, the freedom of movement inquiry "is simply the first step in the analysis, not the last." *Id.* "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." Instead, courts must also ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

In the context of questioning an inmate, the Supreme Court has declined to adopt a bright line rule that imprisonment alone is sufficient to constitute custody within the meaning of *Miranda*. *Howes*, 565 U.S. at 511. Rather, "the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Id.* at 514 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)); *accord Bruce v. United States,* 439 F.Supp.2d 364, 371 (M.D. Pa. 2006) ("Because restraint on freedom is the status quo of a prisoner, the courts examine the totality of the circumstances surrounding the interrogation to ascertain whether the defendant should be deemed 'in custody' for purposes of *Miranda*.").

Here, the Government concedes that Blanco was in custody on September 2, 2022 for purposes of the *Miranda* inquiry. (Hr'g Tr., June 16, 2023, at 55, 56).[3] Therefore, at issue is only whether the September 2 meeting between Turner and Blanco was an "official interrogation."

As conceptualized under *Miranda*, an "interrogation" must "reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. In determining whether an "interrogation" occurred, a Court should look to the "perceptions of the suspect, rather than the intent of the police" so as to ensure that a suspect in custody is provided "an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id.* Nonetheless, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-

---

[3] The Government has conceded that Defendant was in custody for purposes of *Miranda* and therefore this prong of the analysis is not at issue before this Court. However, were the Government's position otherwise, this Court would have recognized the existence of an issue deserving of further examination.

9

302 (emphasis in original). Thus, in determining whether particular police conduct is an "interrogation", a Court must remember the purpose behind *Miranda* and its progeny: "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); *see also, United States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006) ("The premise of *Miranda* is that a suspect speaking with those whom he knows to be law enforcement officers 'will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.'")(quoting *Illinois v. Perkins*, 496 U.S. 292, 296-297 (1990)).

In this case, there is no testimony or other evidence to suggest that Turner engaged in an official interrogation or its functional equivalent on September 2, 2022 when speaking with Blanco.

The essentially one-sided conversation between Turner and Blanco did not include any express questioning of Blanco as to his affiliation with the Surenos. As Turner testified, "[he] wasn't there to gain any information from [Blanco] or ask him any questions [and instead] was there to inform him on the disassociation process and advise him he has an opportunity to disassociate himself or to refuse. . . ." (Test. of Turner, Hr'g Tr., June 16, 2023, at 29; *see also, id.* at 46). Although Turner clearly presumed that Blanco was a member of the Sureno gang,[4] there is no testimony or other evidence to contradict Turner's

---

[4] Turner testified that he was aware of Blanco's affiliation with the Sureno gang when he met with

statement of his intent or to indicate that Turner asked any questions to Blanco about his gang affiliation. Nor is there evidence that Blanco perceived Turner's statements as compelling an admission that he was a member of the Surenos. Instead, the evidence presented only supports a finding that Turner informed Blanco about the Gang Disassociation Program, and when Blanco declined to participate in the program, he requested that Blanco sign a Debrief Refusal Form. Blanco's statement that "I'm a Sureno. I don't sign shit" was not in response to questioning by Turner as to any illegal or illicit behavior, but rather a response to Turner's basic request that Blanco sign the form.

Further, the evidence does not lead to the conclusion that Turner's conduct or statements made on September 2 about the Gang Disassociation Program constituted a "coercive police practice" or that Blanco perceived it as such. Turner's statements to Blanco provided him with information about the Gang Disassociation Program. There is no evidence that Turner engaged in conduct, asked Defendant questions, or made statements that were reasonably likely to elicit an incriminating response from Blanco, including any direct or indirect reference to the assault of Rivera-Suazo or other criminal activity related to the Sureno gang. Rather, Turner's testimony supports a determination that the only purpose of his meeting with Blanco was to inform him of the Disassociation Program and to offer him the opportunity to join this program. Although Blanco was in handcuffs, Turner

---

Blanco on September 2 based on Blanco's self-admission at another facility that he was affiliated with the Surenos as well as from Blanco's tattoos, "group photos and other inmates that he associated with on a daily basis." (Test. of Turner, Hr'g Tr., June 16, 2023, at 24).

11

and the other officer present were not armed and the meeting took place in a "normal office-sized room" without bars. The meeting was short, designed to be informational only, and Turner did not engage in a "lengthy harangue" of Blanco or make "particularly 'evocative'" comments, see *Innis*, 446 U.S. at 303. Nor is there evidence that Blanco, an inmate since 2016 with a "extensive criminal history" since 2001 (Test. of Turner, Hr'g Tr., June 16, 2023, at 16), had an "unusual susceptibility" to a particular form of persuasion which would have led Turner to know that his words or actions were reasonably likely to elicit an incriminating response from Blanco or that Blanco was "unusually disoriented or upset" at the time of the meeting. See *Innis*, 446 U.S. at 302 n.8, 303.[5]

In addition, in looking at the totality of the circumstances, the Court finds that Blanco's statement on September 2, 2022 was voluntary. Under *Miranda*, "[v]olunteered statements of any kind are not barred by the Fifth Amendment. . . ." *Miranda*, 384 U.S. at 478. A statement is involuntary when the defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In determining whether a statement is voluntary, courts must consider "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting

---

[5] As Turner testified, during the course of initial debriefing interviews that he had conducted, hundreds of inmates have refused to join the Disassociation Program and when so refusing, did not indicate the name of the gang they were allegedly associated with. (Test. of Turner, Hr'g Tr., June 16, 2023, at 52).

*Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)). "These surrounding circumstances include 'not only the crucial element of police coercion,' but may also include 'the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.'" *Lam v. Kelchner,* 304 F.3d 256, 264 (3d Cir. 2002) (first quoting *Colorado v. Connelly,* 479 U.S. 157, 167 (1986), then quoting *Withrow v. Williams,* 507 U.S. 680, 693 (1993)). "A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *United States v. Jacobs,* 431 F.3d 99, 108 (3d Cir. 2005) (citing *Oregon v. Bradshaw,* 462 U.S. 1039, 1046 (1983)). "Further, there must be some causal connection between the police conduct and the confession." *Id.* (citing *Connelly,* 479 U.S. at 164). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.* at 108-09 (citing *Lego v. Twomey,* 404 U.S. 477, 489 (1972)).

Upon examination of the circumstances of the September 2 conversation, it is evident that Blanco's statement that "I'm a Sureno. I don't sign shit", made following Turner's explanation about the Gang Disassociation Program and upon Turner's request that he sign the Debrief Refusal Form, was made voluntarily. Blanco was imprisoned at the time of the underlying events since 2016 and had an "extensive criminal history" since 2001. Turner's testimony and the record evidence demonstrates that Blanco also had experience speaking with prison officials both within and outside of investigatory settings. (*See e.g.,*

13

Hr'g Ex. G-4(A)-(D), 5). There is nothing in the record that would call into question Blanco's maturity, education, mental or physical health at the time of the interview. Although the Government concedes that the circumstances of the conversation in the Lieutenant's Office were sufficient for a finding of that Blanco was in custody, they are not so coercive as to support a finding that Blanco's will was overborne during the interview. As previously explained, while Blanco was in hand restraints, the two officers were not armed, the conversation with Turner was brief and took place in a regular office, and there was no indication that Turner or the other officer used physical force, threatened Blanco in any manner, or asked any questions which would be reasonably likely to elicit an incriminating response from Blanco. Based on the totality of the circumstances, the Court finds that Blanco's statement was voluntary.

For the foregoing reasons, and upon consideration of the testimony and exhibits presented at the evidentiary hearing and the parties' briefs and oral argument, the Court will grant Defendant's motion to suppress Defendant's statement made on August 24, 2022, but will deny the motion to suppress Blanco's statement made on September 2, 2022 where Blanco was not subject to a "custodial interrogation" and Turner was thus not required to provide Blanco with any *Miranda* warnings on that day.

## IV. CONCLUSION

For the reasons set forth herein, Defendant Blanco's Motion to Suppress Statements (Doc. 40) will be granted in part and denied in part as set forth herein. A separate Order follows.

Robert D. Mariani
United States District Judge