**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | :  **3:22-CR-318** |
| | :  **(JUDGE MARIANI)** |
| VICTOR BLANCO, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I.  INTRODUCTION AND PROCEDURAL HISTORY

On September 13, 2022, a federal grand jury indicted Defendant Victor Blanco for

Assault with a Dangerous Weapon, in violation of 18 U.S.C. § 113(a)(3) and § 2 (Count 1).

(Doc. 1).  The Indictment alleges that:

> On or about August 24, 2022, in the Middle District of Pennsylvania, within the
> special maritime and territorial jurisdiction of the United States, to wit, United
> States Penitentiary Canaan, Waymart, Pennsylvania, the defendants,
>
> VICTOR BLANCO and
> ISAAC CARRENO,
>
> aiding and abetting each other and aided and abetted by each other, did
> knowingly and intentionally assault an individual with a dangerous weapon,
> namely a sharpened metal object with a bed sheet handle, with intent to do
> bodily harm, and without just cause or excuse.

(Doc. 1, at 1-2).

On November 4, 2024, the Court held a non-jury trial in this action.  Prior to the

bench trial, the Government requested that the Court "make a written decision as to the

findings of [the] court in this case" (Doc. 138, at 14).  Therefore, in accordance with Federal

Rule of Criminal Procedure 23(c), the Court sets forth herein its specific findings of fact and conclusions of law.  For the reasons below, the Court finds Defendant Victor Blanco guilty of Count 1 of the Indictment.

## II. FINDINGS OF FACT

1. The Government called the following witnesses at trial: Mark Turner, Allison Glossenger, Tory Samson, Ryan Swartzfager, and Kenneth Oakley.  (*See generally*, Nov. 4, 2024, Bench Trial Transcript, Doc. 143 (hereinafter "Trial Tr.")).

2. The following exhibits by the Government were entered into evidence: 1.1-1.3; 2.1-2.18; 2.20-2.22; 3.1-3.5; 4.1-4.4; 5.1-5.13.

3. Defendant did not call any witnesses or enter any exhibits into evidence.

4. The United States Penitentiary-Canaan ("USP-Canaan"), located in the Middle District of Pennsylvania, is within the special maritime and territorial jurisdiction of the United States.  (Trial Tr., at 3-5; "Stipulation" by Government and Defendant, Doc. 140, ¶ 1).

5. On August 24, 2022, Victor Blanco, Isaac Carreno, and Francisco Rivera-Suazo were federal inmates incarcerated at USP-Canaan.  (Trial Tr., at 3-5; "Stipulation" by Government and Defendant, Doc. 140, ¶ 2).

6. Tory Sampson is a Senior Officer Specialist at USP-Canaan. (Trial Tr., at 9). Sampson held this position in August of 2022.  The duties of this position include maintaining security at USP-Canaan, supervising inmates, and maintaining

"accountability of inmates and equipment."  (*Id.* at 10).

7. Sampson was working in the Center Tower (also known as Tower 7) as the Number 2 Officer in the Center Tower at USP-Canaan on the morning of August 24, 2022. (Trial Tr., at 9-10).

8. Sampson testified that at approximately 8:35 a.m. on August 24, 2022, he observed a fight in Rec Yard 3.  At that time, he hit the alarm to advise the inmates to stay on the ground and fired two aerial dispersion rounds.  Sampson did not leave the tower at that time. (Trial Tr., at 11-12).

9. From the Tower, Sampson could see that three inmates were involved in the altercation and that "one inmate was holding another inmate while he was being stabbed by the third inmate."  Sampson could not see which inmate held the knife. (Trial Tr., at 13).

10. Mark Turner worked at USP-Canaan from 2012 to 2015 and then from 2016 to 2023. (Trial Tr., at 16).

11. In August of 2022, Turner was a Special Investigative Services Lieutenant.  As a member of the Special Investigative Services ("SIS"), he has received training in evidence recovery, video surveillance training, and different investigation techniques. (Trial Tr., at 17).

12. During the course of his career with SIS, Turner has participated in hundreds of investigations, including homicides, assaults with and without weapons, sexual

3

assaults, protective custody cases, and threat assessments.  (Trial Tr., at 18-19).

13. Common investigatory tools used by SIS investigators when beginning an

investigation include attempting to interview the inmates involved in an incident as

well as their cell mates or other inmates in general population; reviewing video

surveillance, if available; monitoring inmates' communications including their emails

and phone calls; and reviewing inmates' finances and disciplinary records.  The SIS

also attempts to collect and safeguard any physical evidence, if applicable.  (Trial

Tr., at 21).

14. USP-Canaan has video surveillance showing both the outdoor areas and interior of

the prison.  (Trial Tr., at 20).

15. Turner described the physical layout of USP-Canaan as follows:

> USP Canaan, if you were to look at it from an aerial view, is a rectangle in
> shape. The long sides of the rectangle are buildings that are consistent of
> the inmate living quarters, the housing assignments, the housing units, and
> the shorter sides of the rectangle are areas that consist of Religious
> Services, Psychology, Education, Indoor Recreation, Commissary, Laundry,
> the chow hall, Health Services and the Lieutenant's office.
>
> And inside that triangle, there is three separate [outdoor] recreation yards,
> which, also, consist of a softball field, numerous basketball courts, numerous
> hand ball courts, numerous bocce ball courts, a softball field and two tracks
> that go around the softball field and there's a soccer field and two tracks that
> go around the softball field and soccer field.

(Trial Tr., at 19).

16. The inmates at USP-Canaan have access to the recreational yards throughout the

day and are able to enter or exit the recreation yard at various time intervals from

approximately 6 a.m. to 9 p.m. (Trial Tr., at 20).

17. At approximately 8:30 a.m. on August 24, 2022, Turner was in the SIS Office when

he was informed of an incident occurring in Rec Yard 3. As Turner described:

> when we heard the assault over the radio, my office begins pulling up video
> surveillance to get a preliminary idea of what happened, what had occurred,
> and we witnessed a two-on-one assault, and, then, at that time, we begin
> grabbing our pen and paper, and by the time we got inside where the assault
> took place, the inmates were already being escorted up the compound to
> the Lieutenant's office.

(Trial Tr., at 22).

18. Turner thereafter went to the Lieutenant's office, where Blanco and Carreno were

secured and then to Health Services, where inmate Rivera-Suazo had been taken

immediately after the incident in Rec Yard 3. (Trial Tr., at 23, 28).

19. Ryan Swartzfager, currently a SIS Technician at USP-Canaan, was a Senior Officer

Specialist at USP-Canaan in August of 2022. (Trial Tr., at 62-63).

20. On the morning of August 24, 2022, Swartzfager was the Compound No. 1 Officer at

USP-Canaan. In this role, he monitored and controlled inmate movement on the

compound and watched for signs of disturbances or violations of BOP policy. (Trial

Tr., at 63).

21. At approximately 8:35 a.m. that day, Swartzfager responded to a fight in Rec Yard 3

and went to Gate No. 2. When he arrived, he observed two inmates assaulting a

third inmate. At trial, he identified these three inmates as Blanco, Carreno, and

Rivera-Suazo. Swartzfager gave the inmates multiple orders to get on the ground

and then waited for additional staff to arrive before entering the yard.  (Trial Tr., at 63-64).

22. Upon entering the yard, Swartzfager went to Rivera-Suazo, who was on the ground, placed him in hand restraints and conducted a pat-search.  Swartzfager observed multiple injuries to Rivera-Suazo's torso.  (Trial Tr., at 65).

23. Swartzfager was informed by the SIS Department that Carreno had gone to one of the storm drains in the yard and possibly dropped something down the drain, causing Swartzfager to search the yard, including the drain, for weapons or other contraband.  (Trial Tr., at 65).

24. Swartzfager found a brown cloth, prison-issued glove in the water in the bottom of the drain.  An 8½ inch prison-made metal weapon was inside the glove. (Trial Tr., at 65-66) (*see also*, Gov. Ex. 2.12-2.18; 2.20; 2.22; Trial Tr., at 66-72).

25. Swartzfager never saw Blanco or Carreno hold the weapon recovered from the drain.  (Trial Tr., at 73).

26. Three video recordings were admitted into evidence at trial depicting three different angles showing the incident between Blanco, Carreno, and Rivera-Suazo in Rec Yard 3 on August 24, 2022.  (Gov. Ex. 1.1, 1.2, 1.3).

27. The first video is angled to show Gate 2, leading into Rec Yard 3 on the right side of the screen.  (Gov. Ex. 1.1; Trial Tr., at 30).  Three inmates appear on screen, two walking side-by-side (Blanco and Rivera-Suazo) and one walking slightly ahead

(Carreno).  As the inmates approach the end of the sidewalk and are near Gate 2, Blanco begins punching Rivera-Suazo.  Within seconds, Carreno runs towards the fight and repeatedly stabs Rivera-Suazo's torso. Blanco can be seen behind Rivera-Suazo, holding him with one arm and striking him with the other arm while Carreno punches and stabs Rivera-Suazo.  After approximately 15-20 seconds, Carreno runs off screen towards the middle of the yard while Blanco and Rivera-Suazo continue to fight.  Carrero returns and begins punching Rivera-Suazo again with Blanco.  Within one minute from the commencement of the altercation, all three inmates are on the ground and correctional officers arrive and begin placing the inmates in restraints and patting them down.  (*See* Gov. Ex. 1.1, at 0:08-1:22; Trial. Tr. 32-33).

28. The second video shows another angle of Rec Yard 3.  (Gov. Ex. 1.2; Trial Tr., at 34).  Although the altercation between Blanco, Carreno, and Rivera-Suazo is only seen from a distance, the video clearly shows an individual involved in the altercation run towards the middle of the Yard, lean over, and then run back to the altercation. (*See* Gov. Ex. 1.2, at 1:25-1:37).

29. The third video recording is taken from the Tower. (Gov. Ex. 1.3; Trial Tr., at 34-35).  The altercation at issue is initially off-camera, however, an individual is seen running from off-camera, to a grassy area in the Yard, where leans over and then runs back to where the altercation is taking place off-camera.  (Gov. Ex. 1.3, at 1:28-1:34).  Soon thereafter, the camera turns to the location of the altercation and zooms in on

the last ten seconds of the three inmates fighting; depicting Blanco and Carreno

punching Rivera-Suazo and knocking him to the ground.  (Gov. Ex. 1.3, at 1:39-

1:50).

30. Photographs of the sidewalk immediately inside Rec Yard 3, approximately where

the three inmates were fighting and then lying on the ground, show approximately 10

blood stains.  (Gov. Ex. 2.4-2.6).

31. Photographs of Blanco taken in the SIS Lieutenant's Office immediately after the

incident in Rec Yard 3 show Blanco with patches of blood on the bottom half of his

gray sweatshirt.  (Gov. Ex. 3.1; *see also*, Gov. Ex. 3.4).  The photographs of Blanco

do not show any discernable physical injuries on his body.  (*See* Gov. Ex. 3.2, 3.3).

32. The photographs taken of Carreno in the SIS Lieutenant's Office immediately after

the incident in Rec Yard 3 show Carreno wearing a gray sweatshirt with blood on

one sleeve and blood near the stomach area.  (Gov. Ex. 4.1, 4.2, 4.4).  The

photographs do not show any physical injuries on Carreno's body.  (*See* Gov. Ex.

4.3).

33. Kenneth Oakley is a paramedic at USP-Canaan and works in the Health Service Unit

(Trial Tr., at 51, 53).

34. Oakley responded to a call at Rec Yard 3 on August 24, 2022.  Upon his arrival, he

observed three inmates restrained on the ground and helped take Rivera-Suazo to

the Medical Service Unit.  (Trial Tr., at 54-55).

8

35. At the Medical Service Unit, Oakley helped treat Rivera-Suazo for "possible life-threatening injuries of multiple stab wounds [and] abrasions." (Trial Tr., at 55).[1]

36. Photographs of Rivera-Suazo receiving medical attention in the trauma room at Health Services at USP-Canaan, together with the testimony of Oakley, establish that Rivera-Suazo suffered the following injuries: (1) stab wound and laceration to the left side of his body, above the hip; (2) stab wound and laceration to the back of his bicep; (3) laceration on the top of the head; (4) abrasions to the left side of the head; (5) abrasion, bruising, and swelling of his left ear; and (6) abrasion on his left shoulder. (Gov. Ex. 5.1-5.13; Trial Tr., at 55-58).

37. Oakley testified that his "Response Memo" documented that Rivera-Suazo had "[a]pproximately, four 2-centimeter lacerations, two in the left posterior chest, back, one left lower quadrant of the abdomen, one right lower back at the waistline, then, superficial lacerations to the hands." (Trial Tr., at 60).

38. Upon review of his notes, Oakley stated that Blanco had an abrasion and laceration to his lip and Carreno had an abrasion to the left knee, all of which were minor. (Trial Tr., at 59).

---

[1] On cross-examination, Oakley explained that the lacerations to Rivera-Suazo's abdornen, lower back and chest area may have been life-threatening, although he would have needed a CT scan to determine the depth of these wounds. (Trial Tr., at 61).

### III. CONCLUSIONS OF LAW

Title 18 U.S.C. § 113, prohibits a person, within the special maritime and territorial

jurisdiction of the United States, of committing assault with a dangerous weapon, with intent

to do bodily harm.  18 U.S.C. § 113(a)(3).  To establish that a person is guilty of this

offense, the Government must prove the following elements beyond a reasonable doubt:

> (1) the defendant assaulted Rivera-Suazo by intentionally striking or wounding
> him;
>
> (2) the defendant acted with the intent to do bodily harm to Rivera-Suazo;
>
> (3) the defendant used a dangerous weapon; and
>
> (4) the assault took place within the special maritime and territorial jurisdiction
> of the United States.

Ninth Cir. Model Crim. Jury Instructions, § 8.5 (2024).  *See also*, *United States v. Taylor*,

686 F.3d 182, 188 (3d Cir. 2012) ("a conviction under that subsection [§ 113(a)(3)] requires

proof of only three elements: (1) assault; (2) with specific intent to inflict bodily harm; and (3)

use of a dangerous weapon).

In this case, the Government alleges that Blanco assaulted Rivera-Suazo by

punching him, but also aided and abetted Carreno in assaulting Rivera-Suazo with a

dangerous weapon, specifically, the sharp metal weapon found by Swartzfager in the Rec

Yard drain.

To find Blanco guilty of assault with a dangerous weapon on the basis that he aided and abetted Carreno in committing the offense, the Government must prove the following elements beyond a reasonable doubt:

> (1)  That Carreno committed the offense charged, *i.e.* assault with a dangerous weapon, by committing each of the elements of that offense;
>
> (2)  That Blanco knew that the offense charged was going to be committed or was  being committed by Carreno;
>
> (3)  That Blanco knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging Carreno in committing the specific offense charged and with the intent that Carreno commit that specific offense; and
>
> (4)  That Blanco performed an act in furtherance of the offense charged.

Third Cir. Model Crim. Jury Instructions, § 7.02 (2024).  *See also, United States v. Centeno*, 793 F.3d 378, 387 (3d Cir. 2015) ("With respect to 'aiding and abetting' under 18 U.S.C. § 2, the Government must prove: (1) that another committed a substantive offense; and (2) the one charged with aiding and abetting knew of the commission of the substantive offense and acted to facilitate it.  Additionally, we require proof that the defendant had the specific intent to facilitate the crime. . .  [O]nly some affirmative participation which at least encourages the principal offender to commit the offense is required.  There must, however, be more than associat[ion] with individuals involved in the criminal venture.  Neither mere presence at the scene of the crime nor mere knowledge of the crime is sufficient to support a conviction.  A defendant is not guilty of aiding and abetting an offense unless the defendant did something to forward the crime and was a participant rather than merely a

knowing spectator.") (internal citations and quotation marks omitted).

Here, the uncontroverted testimonial and video recording evidence establishes that inmates Blanco and Carreno assaulted inmate Rivera-Suazo at approximately 8:30 a.m. on August 24, 2022, in Rec Yard 3, by punching and striking him. It is also undisputed that Rivera-Suazo was stabbed multiple times by Carreno and suffered abrasions and lacerations to his upper body and head as a result of the physical assault by both Blanco and Carreno and as a result of being stabbed by Carreno. The evidence does not support a finding, nor does the Government assert, that Blanco himself held the metal weapon that morning or personally stabbed Rivera-Suazo.

The first element that the Government must prove to establish that Blanco aided and abetted Carreno, *i.e.* that Carreno committed the offense of assault with a dangerous weapon, is not in serious dispute. The testimony at trial, in conjunction with the video recordings of the incident on August 24, 2022, clearly show that Carreno assaulted Rivera-Suazo for approximately one minute by repeatedly punching him in the head and torso and stabbing his upper body multiple times with a weapon, later discovered in the drain to be a metal shank. This establishes beyond a reasonable doubt that Carreno assaulted Rivera-Suazo with a specific intent to inflict bodily harm and with the use of a dangerous weapon. The parties further stipulated that USP-Canaan is within the special maritime and territorial jurisdiction of the United States.

The Government has also proved the second necessary element beyond a reasonable doubt, specifically that Blanco knew that Carreno was going to assault Rivera-Suazo with the sharpened metal weapon or, at minimum, that Blanco knew that Carreno was assaulting Rivera-Suazo at the time of the incident by stabbing him with the metal weapon.

The Government plausibly argued at trial that the video evidence, specifically Government Exhibits 1.1-1.3, show that Blanco picked the location of the assault. (Trial Tr., at 78-79; 81). After walking the length of Rec Yard, Blanco waited until he and Rivera-Suazo were at the corner of the Yard, effectively cornering Rivera-Suazo and eliminating most of avenues of escape. The Government further submitted that this location was also chosen by Blanco because it was near the drain where the metal weapon was discarded. (Trial Tr., at 79; 81). The location's proximity to the drain does provide some circumstantial evidence of premeditation and Blanco's knowledge that Carreno had a weapon and would want to be close to a place where it could be easily discarded. The timeline in the videos provide further strong support for a finding that Blanco knew Carreno had a weapon and intended to use it during the attack on Rivera-Suazo. Government's Exhibit 1.1 depicts Blanco first attacking Rivera-Suazo at 00:21. Within one second, it appears that Carreno takes an object out of his pocket or waist band and runs towards the altercation. At 00:23, Blanco is already attempting to place himself behind Rivera-Suazo and is able to do so within one second. No later than 00:25, Carreno first stabs the victim. Thus, within 4 to 5

seconds after the altercation begins, Blanco is behind Rivera-Suazo, holding and striking him, while Carreno stabs him.  This very brief time frame heavily suggests that the attack was planned and that Blanco knew Carreno had a weapon, intended to use it, and that Blanco was attempting to restrain Rivera-Suazo in a position where Carreno could most quickly and easily use the weapon to strike Rivera-Suazo.

Even if there was not sufficient evidence that Blanco knew prior to the incident that Carreno had a weapon, or that he intended to use it, the evidence at trial established beyond a reasonable doubt that Blanco knew Carreno was stabbing Rivera-Suazo with a dangerous weapon at the time of the incident.  The Court rejects Defendant's argument that Blanco's view of Carreno's actions was "obstructed" because he was standing behind Rivera-Suazo. (*See* Trial Tr., at 82-83).  Carreno stabbed Rivera-Suazo over the course of approximately 15 seconds.  Upon review of Government's Exhibit 1.1 which clearly shows where the three inmates were located in relation to each other at all times during the assault, and applying common sense and reason, it is evident that over the course of the time that Carreno was stabbing Rivera-Suazo, Blanco would, and did, see that Rivera-Suazo was holding a weapon and that he was repeatedly thrusting it towards, and into, Rivera-Suazo's torso. Furthermore, the fact that Blanco stood behind Rivera-Suazo and held him in place, thus preventing him from moving, supports a reasonable inference that he did so because he knew Carreno was stabbing Rivera-Suazo and Blanco was attempting to aid Carreno in his actions.

14

The evidence at trial also established beyond a reasonable doubt that, knowing Carreno was stabbing Rivera-Suazo with a metal weapon, Blanco knowingly acted to aid and facilitate Carreno in committing the assault with a deadly weapon, with the intent that Carreno commit this offense, and that his acts were in furtherance of the assault with a deadly weapon.  As Carreno repeatedly stabbed Rivera-Suazo, Blanco stood behind the victim and held him in place, preventing him from moving, escaping, or collapsing to the ground.  While holding him in place with one arm, Blanco continued to strike Rivera-Suazo with his other arm, further incapacitating Rivera-Suazo and leaving him increasingly unable to defend himself from Carreno's attack with the weapon.  Absent knowledge of Carreno's possession of the weapon at that time, and that he was using it to stab the victim, there is little reason for Blanco to only use one arm to assault Rivera-Suazo or to be using one arm to firmly hold Rivera-Suazo from behind.  Additionally, by placing himself behind the victim and preventing him from moving, Blanco knowingly provided Carreno with unobstructed access to the front of Rivera-Suazo's body, allowing Carreno to more easily stab Rivera-Suazo and preventing Rivera-Suazo from fighting back or engaging in measures to protect himself from the weapon and from being stabbed.

The Government has thus met its burden of proof of establishing beyond a reasonable doubt each element of assault with a dangerous weapon, aiding and abetting.

## IV. Conclusion

For the foregoing reasons, the Court finds that the Government has proven beyond a reasonable doubt that Defendant Victor Blanco is guilty of Count 1 of the Indictment, specifically, Assault with a Dangerous Weapon, and did so by aiding and abetting Isaac Carreno, all in violation of 18 U.S.C. § 113(a)(3) and § 2.

A separate order setting forth the Court's verdict follows.

Robert D. Mariani
United States District Judge